FILED

2012 NOV - 1  PM 3: 59

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
SANTA ANA

BY _____

1  DANIEL FEINBERG – CA State Bar No. 135983
Email: dfeinberg@lewisfeinberg.com
2  MARGARET E. HASSELMAN – CA State Bar No. 228529
Email: mhasselman@lewisfeinberg.com
3  LEWIS, FEINBERG, LEE, RENAKER & JACKSON, P.C.
4  476 9th Street
5  Oakland, CA 94607
Tel: (510) 839-6824
6  Fax: (510) 839-7839

7
*Attorneys for Plaintiff*
8
9  *Additional Counsel listed on following page*

10       IN THE UNITED STATES DISTRICT COURT
         FOR THE CENTRAL DISTRICT OF CALIFORNIA
11                 SOUTHERN DIVISION

12

| | |
|---|---|
| EVOLVE BANK & TRUST, in its capacity as Special Trustee of the Southern California Pipeline Construction, Inc. Employee Stock Ownership Plan, <br><br> Plaintiff, <br><br> vs. <br><br> BCC CAPITAL PARTNERS, LLC, a California limited liability company; DIANE BIXLER, in her capacity as Successor-in-Interest, Trustee and/or Personal Representative; MICHAEL HARDEN, an individual; PHILLIP CHOU, an individual; GLENN M. GELMAN, an individual; and GLENN M. GELMAN & ASSOCIATES, a California accountancy corporation; and DOES 1-10, inclusive, <br><br> Defendants. | Case No.   **SACV12-01901 AG (ANx)** <br><br> COMPLAINT FOR VIOLATION OF CALIFORNIA SECURITIES LAWS <br> Corporations Code §§ 25401, 25504 and 25504.1 <br><br> DEMAND FOR JURY TRIAL |

28  COMPLAINT FOR VIOLATION OF CALIFORNIA SECURITIES LAWS
CASE NO.                    Page 1

1  RICHARD E. DONAHOO – CA State Bar No. 186957
2  Email: rdonahoo@donahoo.com
3  DONAHOO & ASSOCIATES
   440 W. First Street, Suite 101
4  Tustin, California 92780
5  Tel: (714) 953-1010
   Fax: (714) 953-1777
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28  COMPLAINT FOR VIOLATION OF CALIFORNIA SECURITIES LAWS
    CASE NO.                    Page 2

1    1.    Plaintiff EVOLVE BANK & TRUST ("Evolve"), in its capacity as

2    Special Trustee of the Southern California Pipeline Construction, Inc. Employee

3    Stock Ownership Plan ("the ESOP"), invokes this Court's jurisdiction pursuant to

4    28 U.S.C. § 1332, and alleges against Defendants BCC CAPITAL PARTNERS,

5    LLC ("BCC"), DIANE BIXLER, in her capacity as Trustee of the Edward and

6    Diane Bixler Living Trust and/or personal representative of the Estate of Edward

7    Bixler ("Bixler"), MICHAEL HARDEN ("Harden"), PHILLIP CHOU ("Chou"),

8    GLENN M. GELMAN ("Gelman"), GLENN M. GELMAN & ASSOCIATES

9    ("Gelman & Associates") and DOES 1-10 as follows:

10                   **I.    INTRODUCTION**

11    2.    On or about November 21, 2007, Joel P. Spear and Linda Spear ("the

12    Spears"), as co-trustees of the Joel and Linda Spear Family Trust ("the Spear

13    Family Trust"), which owned 100% of the stock of Southern California Pipeline

14    Construction, Inc. ("SCPC") stock, entered into a Stock Purchase Agreement with

15    the Trustee of the Southern California Pipeline Construction, Inc. ESOP ("the

16    ESOP" or "the Plan") whereby the Spear Family Trust sold 100% of SCPC's stock

17    to the ESOP ("November 2007 Transaction").  As described below, the Spears

18    engaged in fraud in the November 2007 Transaction, e.g., by inflating SCPC's

19    financial projections, withholding material information from the Trustee of the

20    ESOP and his advisors, and making promises which they never intended to keep.

21    3.    The Spears were aided and abetted in the November 2007 Transaction

22    by Defendants BCC, Bixler, Harden, Gelman, Gelman & Associates, and Does 1-

23    10.

24    4.    Daniel M. Reser ("Reser"), then the Trustee of the ESOP, represented

25    the ESOP in the November 2007 Transaction.

26    5.    The ESOP paid the Spear Family Trust $35,000,000 for the SCPC

27    shares purchased in the November 2007 Transaction.

28    COMPLAINT FOR VIOLATION OF CALIFORNIA SECURITIES LAWS
CASE NO.                              Page 3

6.     Plaintiff Evolve, in its capacity as Special Trustee of the ESOP, alleges that the ESOP was the victim of securities fraud by Defendants, who aided and abetted the Spears in making material misrepresentations and omissions, thereby inflating the purchase price paid for the SCPC stock purchased by the ESOP in the November 2007 Transaction.  The SCPC stock owned by the ESOP currently has no value.

7.     The Plan's losses are due to the Defendants' acts and omissions related to the November 2007 Transaction.

8.     SCPC appointed Evolve as Special Trustee of the ESOP on October 1, 2012.  Evolve had no role in the November 2007 Transaction and no relationship with SCPC or the SCPC ESOP prior to its engagement as Special Trustee. Evolve's counsel of record in this action first learned of Defendants' acts and omissions in aiding and abetting the Spears' fraud in the November 2007 Transaction from counsel's review of documents produced by Defendants in February and March 2012 in response to a document subpoena in a different lawsuit, *Vincent, et al., v. Reser, et al.*, (No. C11-03572 CRB (N.D. Cal.).

## II.     JURISDICTION AND VENUE

9.     This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 because this action is between citizens of different states and the amount in controversy exceeds $75,000.

10.     This Court has personal jurisdiction over Defendants because they are authorized and licensed to transact business in California and transacted business as alleged in this Complaint in the County of Orange, and/or reside in the County of Orange.

11.     Venue is properly laid in this District because those individuals named in this complaint as defendants are residents of the County of Orange.

//

COMPLAINT FOR VIOLATION OF CALIFORNIA SECURITIES LAWS
CASE NO.                              Page 4

### III.     THE PARTIES

12.     Plaintiff Evolve is, and at all relevant times herein was, an Arkansas chartered bank corporation duly appointed and acting as Special Trustee of the ESOP.  SCPC appointed Evolve as Special Trustee of the ESOP on October 1, 2012. The Special Trustee's appointment specifically authorizes Evolve to evaluate potential claims that could be brought by the ESOP against Defendants and their affiliates arising out of the November 2007 Transaction, and, if appropriate, bring those claims on behalf of the ESOP.  Evolve's principal place of business is located in Memphis, Tennessee.  The Trustee of the ESOP is First Bankers Trust Services, Inc., an Illinois corporation with its principal place of business in Quincy, Illinois.

13.     Defendant BCC Capital Partners, LLC is, and at all relevant times herein was, a California Limited Liability Company headquartered and doing business in the County of Orange.  BCC is an investment advisory company whose primary business includes structuring and implementing the sale of a business owner's stock to its employees using an ESOP, with a particular focus on the 100% ESOP buy-out and tax-deferred sales.  BCC specializes in advising business owners and companies in ESOP transactions.

14.     Upon information and belief, Edward Bixler died in September 2012. At all relevant times, Bixler was the founder and member of BCC, and identified himself as the Managing Partner of BCC.  At all relevant times, Bixler resided in and did business in the County of Orange.  Upon information and belief, Bixler's will has not yet been filed in probate court.  Plaintiff does not know whether Edward Bixler's estate will be probated, or if his property and assets were held in a living trust.  Plaintiff does not know the identity of Bixler's insurer(s).  If Bixler's estate is probated, Plaintiff intends to file a creditor's claim in probate court and a claim with any insurer.  Upon information and belief, Defendant Diane Bixler is

1  Edward Bixler's successor-in-interest, the personal representative of the Estate of

2  Edward Bixler, and/or the Trustee of any living trust of which Edward Bixler was a

3  settlor.  Plaintiff is ignorant of the true names and capacities of defendants sued

4  herein as Does 1 - 5, inclusive, and therefore sues these defendants by such

5  fictitious names.  Plaintiff will amend this Complaint to allege their true names and

6  capacities when ascertained.  Plaintiff is informed and believes and thereon alleges

7  that each of such fictitiously named defendants is the insurer of Edward Bixler,

8  successor-in-interest to Edward Bixler, personal representative of the Estate of

9  Edward Bixler, Trustee of any living trust of which Edward Bixler was a settlor,

10  and/or a beneficiary of Edward Bixler.

11      15.    Defendant Michael Harden is, and at all relevant times herein was, an

12  individual residing and doing business in the County of Orange.  At all relevant

13  times, Harden was a member of BCC and identified himself as a Partner in BCC.

14  On or about July 1, 2006, Harden acquired a 10% ownership interest in BCC and

15  became one of BCC's members.

16      16.    Defendant Phillip Chou is, and at all relevant times herein was, an

17  individual residing and doing business in the County of Orange.  At all relevant

18  times, Chou was a Vice President of Defendant BCC.

19      17.    Defendant Glenn M. Gelman is and at all relevant times herein was,

20  an individual residing and doing business in the County of Orange.  Mr. Gelman is

21  the founder and managing director of Gelman & Associates.  Mr. Gelman, inter

22  alia, provides accountancy, business consultancy, and financial advisory services.

23  Mr. Gelman holds himself out as a specialist in advising business owners and

24  companies in ESOP transactions.

25      18.    Defendant Glenn M. Gelman & Associates is and at all relevant times

26  herein was, a California accountancy corporation headquartered and doing

27  business in the County of Orange.  Gelman & Associates provides accountancy,

28  COMPLAINT FOR VIOLATION OF CALIFORNIA SECURITIES LAWS
CASE NO.                                    Page 6

1    business consultancy, and financial advisory services.

2         19.    Plaintiff is ignorant of the true names and capacities of defendants

3    sued herein as Does 6 - 10, inclusive, and therefore sues these defendants by such

4    fictitious names. Plaintiff will amend this Complaint to allege their true names and

5    capacities when ascertained.  Plaintiff is informed and believes and thereon alleges

6    that each of such fictitiously named defendant is responsible or liable for aiding

7    and abetting the November 2007 Transaction.  The ESOP's loss as herein alleged

8    was proximately caused by those defendants' acts.

9              **IV.    GENERAL FACTUAL ALLEGATIONS**

10        20.    Joel Spear and his advisors, Defendants and each of them, engaged in

11   deceit and even outright lies in order to maximize the amount of money they could

12   squeeze out of the ESOP in the November 2007 Transaction.

13        21.    With Defendants' help, the Spear Family Trust was able to sell

14   Southern California Pipeline Construction, Inc. (SCPC) stock to the SCPC ESOP

15   for far more than its fair market value.

16        22.    Joel Spear and Defendants inflated SCPC's financial projections

17   solely for purposes of the November 2007 Transaction and concealed an earlier

18   valuation by Duff & Phelps based on much lower projections.  Spear and

19   Defendants also concealed financial statements showing a significant downturn in

20   SCPC's business.  Finally, Defendants assisted Spear in covering up his fraud.

21        23.    As a result of the mountain of debt placed on SCPC by the November

22   2007 Transaction, it could not weather the recession of 2008 and ceased operations

23   in 2010, leaving the ESOP holding worthless stock and hundreds of workers

24   unemployed.

25        24.    Spear's advisors – Defendants BCC, Bixler, Harden, Gelman, Gelman

26   & Associates, and Does 1- 10 – are liable under California securities law as aiders

27   and abettors of the securities fraud.  As aiders and abettors, they are jointly and

28   COMPLAINT FOR VIOLATION OF CALIFORNIA SECURITIES LAWS
     CASE NO.                          Page 7

1   severally liable for the ESOP's losses.

2   **V.    DETAILED STATEMENT OF FACTS.**

3       25.    SCPC was a general engineering contractor specializing in the

4   installation of water, sewer, and storm drain systems for residential housing

5   developments in Southern California. In the years leading up to 2007, SCPC's

6   leading customers and the vast majority of its revenue came from the construction

7   of new residential developments in Southern California.  Southern California

8   residential housing construction grew at a breakneck pace during this period.  In

9   late 2006 and early 2007, however, the bottom fell out of the residential housing

10  construction market, particularly in Southern California.

11
12   **A.  After Duff & Phelps Valued SCPC's Equity at $20 Million, the Spears, at Gelman's Urging, Hired BCC as Their Financial Advisor in the Deal Because BCC Guaranteed an Equity Valuation of at Least $30 Million.**
13

14       26.    Joel and Linda Spear planned to sell their family trust's SCPC stock to

15   the ESOP by the end of 2006.  In 2006, SCPC hired Merrill Lynch and Duff &

16   Phelps as financial advisors for a proposed ESOP transaction.  Duff & Phelps

17   performed due diligence and prepared spreadsheets for a valuation report.  Duff &

18   Phelps used financial projections provided by SCPC in preparing its Discounted

19   Cash Flow (DCF) analysis.  Upon information and belief, Joel Spear helped

20   prepare SCPC's financial projections.  The financial projections provided by SCPC

21   to Duff & Phelps in late 2006 state:

22       SCPC Financial projections, in 000's.

23

|                   | 2006   | 2007   | 2008   | 2009   | 2010   | 2011   |
|-------------------|--------|--------|--------|--------|--------|--------|
| Contract Revenues | 72,500 | 58,000 | 58,000 | 60,900 | 63,945 | 67,142 |
| **EBIT**          | **7,225** | **4,027** | **3,289** | **3,562** | **3,852** | **4,159** |

27.     These projections assumed the residential housing slowdown would impair SCPC's financial results for several years – SCPC told Duff & Phelps that in 2011 contract revenues would still be lower than in 2006.

28.     In December 2006, Duff & Phelps sent Defendant Gelman of Defendant Gelman & Associates their draft valuation spreadsheets showing a value of about $20 million for 100% of SCPC's equity, with a concluded equity value range of $17.3 - $22.5 million.  The Duff & Phelps valuation did not include a discount for lack of marketability of the stock, nor did it account for dilution of the ESOP's equity by synthetic equity, which would have reduced the fair market value of SCPC equity purchased by the ESOP.  In an email message to Joel and Linda Spear dated December 20, 2006, Gelman told the Spears he was not surprised by this value conclusion because Gelman & Associates had valued SCPC at $17 million in 2004.

29.     Nevertheless, Duff & Phelps's valuation greatly upset the Spears – they were hoping to sell their stock for $30 million.  Gelman indicated that $30 million was the Spears' target number in several emails and letters in late 2006 and early 2007.  Of course, Gelman also recognized that it would be impossible for the Spears to get this price from a third-party buyer.  In an email message dated September 18, 2008, Gelman stated "There is no ready buyer for construction companies that competitively bid their work."

30.     Defendant Gelman had not referred the Spears to Merrill Lynch and Duff & Phelps; the Spears had been referred to these ESOP advisors by a different CPA/financial advisor.  Instead, Gelman wanted the Spears to hire Defendant BCC as an ESOP advisor.

31.     Gelman and Gelman & Associates had referred numerous clients to Defendants BCC, Bixler and/or Harden in the past.  In an email dated September 18, 2008, Gelman stated that he had worked with Defendants BCC, Bixler and

1    Harden for over 20 years.

2      32.   Upon information and belief, Gelman & Associates had an agreement

3    with BCC whereby BCC paid Gelman & Associates a kickback from fees received

4    by BCC from clients referred by Gelman.  Neither Gelman & Associates nor BCC

5    disclosed this financial arrangement to the Spears or the Spears' advisors.

6      33.   In an email dated December 4, 2006, Defendant Gelman sent

7    Defendant Bixler an email regarding a "possible new client," i.e., SCPC, and asked

8    Bixler to advise SCPC on how to establish an ESOP by year-end 2006.  Defendant

9    Bixler sent Gelman his initial suggestions by email dated December 5, 2006, and

10   copied Defendant Harden on this email.

11     34.   Since the Spears were upset with the Duff & Phelps valuation,

12   Gelman asked Defendant BCC for a competing "bid" in or about January 2007.  In

13   an email dated September 18, 2008, Gelman stated "The architect of the ESOP

14   Transaction was (is) BCC LLC . . . or BCC Partners LLC . . . specifically Ed

15   Bixler and Mike Harden."

16     35.   In or about early 2007, Gelman provided BCC with copies of SCPC's

17   financial statements.  In a January 26, 2007 email to the Spears, Gelman reported

18   back to the Spears:

19         As I mentioned over the phone Ed Bixler [Managing Partner of BCC]
20         came back with a MINIMUM value of $30,000,000 without any
21         accounting for the unapproved change orders.  In addition, his plan
           would include the 20 percent warrants which would net you an
22         additional $6,000,000 if the company was worth $30,000,000 again
23         when the debt is repaid.  Duff and Phelps [sic] plan would only net
24         you an additional 20 percent of any value OVER $30,000,000, which
           means you are receiving six million LESS even if the valuations are
25         identical.

26

27     36.   Gelman's January 26, 2007 email to the Spears also stated that

28   COMPLAINT FOR VIOLATION OF CALIFORNIA SECURITIES LAWS
     CASE NO.                          Page 10

1 | Gelman would be meeting with Bixler on January 29, 2007 at Gelman &

2 | Associates' Santa Ana office to discuss a potential SCPC ESOP transaction.

3 |     37.    In emails and phone calls in December 2006, Gelman also pushed

4 | Duff & Phelps to provide a higher valuation. In December 2006, Duff & Phelps

5 | prepared a revised draft valuation of about $23 million for 100% of SCPC's equity.

6 | Duff & Phelps, however, would not meet the Spears' demand for a $30 million

7 | valuation. As a result, Joel Spear engaged BCC as SCPC's financial advisor for

8 | the ESOP Transaction in early 2007.

9 |     38.    BCC arranged for SCPC to hire Daniel Reser as the independent

10 | Trustee for the ESOP Transaction, and Stout Risisus Ross ("SRR") as Reser's

11 | financial advisor. BCC had worked with both Reser and SRR in other ESOP

12 | transactions.

13 |
14 | **B.  Joel Spear and His Advisors Inflated SCPC's Financial Projections to Reach the Spears' $30 Million Equity Value Target.**

15 |     39.    After being retained by SCPC, BCC prepared its own valuation of

16 | SCPC as part of a feasibility study for the proposed ESOP transaction. BCC's

17 | "Preliminary Transaction Summary" dated July 6, 2007 valued 100% of SCPC's

18 | equity at $32 million. BCC was focused on meeting the Spears' target number, not

19 | on providing an accurate valuation. For example, BCC did not apply a discount

20 | for lack of marketability, even though the ESOP would be purchasing non-

21 | marketable stock.

22 |     40.    More importantly, Joel Spear and BCC inflated SCPC's financial

23 | projections to increase BCC's value conclusion. Upon information and belief, in

24 | early 2007, Defendants, and each of them, discussed with Joel Spear the idea of

25 | increasing SCPC's financial projections to increase SCPC's value.

26 |     41.    BCC's financial projections in its "Preliminary Transaction

27 | Summary" dated July 6, 2007 are dramatically higher than the projections SCPC

28 |

provided to Duff & Phelps in late 2006:

SCPC Financial projections, in 000's

|  | 2007 | 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|---|
| Contract Revenues | 74,707 | 78,442 | 82,364 | 86,483 | 90,807 |
| **Adjusted EBIT** | **7,545** | **7,893** | **8,703** | **9,554** | **10,447** |

42.    The new revenue projections were about 30% higher than the projections given to Duff & Phelps in late 2006.  The enormous increases in SCPC's projected revenue and EBIT are even more astounding in light of the collapse of the Southern California residential housing construction market during the intervening months. As alleged below, Reser and his financial advisor, SRR, relied on these inflated financial projections in the valuation report used by the ESOP for the November 2007 Transaction.

43.    On August 2, 2007, Defendant Chou sent Reser a "Confidential Summary Transaction Profile" prepared by Defendant BCC as an email attachment.  BCC's Transaction Profile states "The value of the Transaction is estimated at approximately **$35 million**." (Emphasis in original.)

44.    The "Confidential Summary Transaction Profile" stated that SCPC had "intentionally stopped acquiring new projects" from its largest customer, Lennar, "[i]n the first six months of 2007. . . ."  Upon information and belief, this statement was not true and BCC knew that this statement was not true.  Upon information and belief, Lennar, like other Southern California home builders, had cut back significantly on residential construction in 2007, and therefore had hired SCPC on fewer projects.

**C. The Deterioration of the Residential Housing Market Severely Harmed SCPC's Business Prospects in 2007.**

45.     SCPC's internal financial statements from 2007 show that SCPC's revenues fell dramatically during 2007.  According to SCPC's records, specifically SCPC's "Work in Progress" spreadsheets, "Work on Hand" dropped from $20.8 million as of May 8, 2007, to $8.9 million as of July 31, 2007.  Even more alarmingly, all of the projects were listed as "no contract" as of July 31, 2007, and did not have any billings – implying there was $0 of signed backlog or active work in place as of July 31, 2007.  Moreover, almost all of the "Potential Projects" were for single-family residential construction.  These projects had a high risk of being cancelled or delayed due to the deterioration of the Southern California housing market.

46.     SCPC provided copies of its internal financial statements, including its "Work in Progress" spreadsheets, to Defendants Gelman & Associates and BCC throughout 2007.

47.     By email dated August 8, 2007, Defendant Chou sent Moreno an email asking why SCPC had a much higher backlog as of December 31, 2006 ($21 million), than it did as of the summer of 2007.  Defendant Gelman was copied on this email.

48.     By email dated September 25, 2007, Gilbert Moreno ("Moreno"), who was then an employee of Defendant Gelman & Associates but became the Controller of SCPC in December 2007, sent Defendant Chou a copy of SCPC's "Work in Progress" spreadsheet as of July 31, 2007.  Within 20 minutes of receiving the spreadsheet, Chou sent Moreno an email asking Moreno to call him to discuss the spreadsheet.  Upon information and belief, Chou was concerned because SCPC's "Work on Hand" and other financial information contained in the spreadsheet contradicted the financial projections used in BCC's valuation of SCPC.

49.     SCPC, Defendants, and each of them concealed the decline of SCPC's

pending work in progress and the deterioration of SCPC's 2007 financial results from Reser and SRR.  Upon information and belief, SCPC, Defendants, and each of them, did not disclose a copy of SCPC's internal "Work in Progress" spreadsheet as of July 31, 2007, to Reser and SRR.  In September 2007, BCC gave Reser and SRR an inflated statement of SCPC's "Work in Progress."

50.    Gelman was well aware that the Spears were selling damaged goods. In an email to the Spears on September 19, 2007, Gelman told the Spears he was concerned that the delay in the ESOP transaction would reduce SCPC's value:

> We must make the BCC/ESOP deal our top priority.  **The delay [in the ESOP transaction] has also pushed us into the fears of a residential market collapse and may impact value. . . . I have to be creative. I will do so. . . . It is very important to list favorable factors that offset the taint currently facing the residential market.  If the Trustee continues to harp on this issue it will drive the price DOWN.**

(Emphasis added).

51.    Given SCPC's dependence on residential housing construction projects and its business prospects in 2007, there can be no honest explanation for the inflated financial projections used for the November 2007 Transaction.

**D. Joel Spear and His Advisors Hid the Duff & Phelps Valuation from Reser.**

52.    In or about September 2007, Reser gave BCC and Joel Spear a lengthy "Due Diligence Checklist."  The "Due Diligence Checklist" requested extensive documents and information regarding SCPC.

53.    On September 11, 2007, the parties to the transaction held a due diligence meeting at BCC's office in Newport Beach.  The Spears, Defendant Gelman, Defendant Harden, and Reser attended this meeting.

54.    Reser's Due Diligence Checklist for SCPC requested copies of "any

independent valuation reports of the Company for the last 3 years." Defendants BCC, Bixler, and Harden considered whether they should give the Duff & Phelps valuation to Reser and SRR, but decided to withhold the valuation. In an email dated September 24, 2007, Defendant Chou ordered a subordinate not to upload the Duff & Phelps valuation to the online data room used by the parties to the Transaction until Chou discussed the Duff & Phelps valuation with Defendant Harden, telling her it was "very important" that she not post this document.   Chou copied Moreno on this email, so Defendant Gelman & Associates knew that BCC was not providing a copy of the Duff & Phelps valuation to Reser and SRR.

55.     In an email to Defendant Gelman, Moreno, and another employee of Defendant Gelman & Associates on September 26, 2007, Defendant Harden stated **"We will NOT be providing this to the Trust[ee] - they need to do their own analysis, which is what we are paying Andy [Ward] at SRR to do**." (Emphasis added).

56.     In or about November 2007, in conjunction with the closing of the November 2007 Transaction, Defendant BCC prepared responses to the "Due Diligence Checklist" for Joel Spear's signature.  Joel Spear signed the "Due Diligence Checklist" on November 20, 2007, and Defendant BCC provided the signed checklist to Reser on November 20, 2007, as an attachment to an email.  In his signed checklist, Joel Spear averred that there were no "independent valuation reports of the Company and/or the ESOP for the last three years."  Spear's response to the request for independent valuation reports from the last three years was "DNE," i.e., "Does Not Exist."  BCC prepared this response for Spear's signature.

57.     Defendants, and each of them, knew that Reser intended to rely on responses to the Due Diligence Checklist.  Defendants, and each of them, knew Spear's responses to the Due Diligence Checklist were not complete and accurate.

1   BCC prepared the responses for Spear's signatures. Defendants, and each of them,

2   took no action to correct Joel Spear's misstatements on the Due Diligence

3   Checklist.

4   **E. As a Result of Spear and Defendants' Material Misrepresentations and**

5   **Omissions, the ESOP Agreed to Pay $35 Million for SCPC's Equity.**

6   58.   Although BCC had valued SCPC's equity at $32,000,000, the Spears

7   decided to shoot for the moon in negotiating with Reser. On September 25, 2007,

8   Defendant Harden sent the Spears' opening offer of $40,000,000 to Reser and his

9   advisors as an email attachment. Defendants Bixler, Chou, and Gelman were

10   copied on Harden's email. On September 27, 2007, Defendant Chou sent SRR an

11   email attaching BCC's revised financial model for the SCPC ESOP. BCC's

12   revised financial model stated SCPC's equity value was $40 million.

13   59.   The proposed summary term sheet attached to Defendant Harden's

14   September 27, 2007 email included several terms which Defendants, and each of

15   them, knew were not true and/or that Spear did not intend to follow through on.

16   For example, the term sheet stated that the Spears and SCPC had provided or

17   would provide all information requested by the Trustee as part of its due diligence

18   review. Defendants, and each of them, knew that the Spears and SCPC had

19   withheld information requested by Reser as part of his due diligence review as

20   alleged herein and did not intend to provide this information to Reser.

21   60.   Most of the deal terms for the November 2007 Transaction were

22   negotiated at a meeting at BCC's office in Newport Beach on October 8, 2007.

23   Defendants Gelman and Harden attended this meeting, as did Reser and his

24   advisors.

25   61.   At the October 8, 2007 negotiation session, Reser agreed to the $35

26   million price proposed in BCC's Transaction Profile. As alleged below, Reser

27   negotiated for consideration on behalf of the ESOP in addition to the SCPC equity

28   COMPLAINT FOR VIOLATION OF CALIFORNIA SECURITIES LAWS

1  purchased by the ESOP.

2       62.    Reser's financial advisor, SRR, using inflated financial projections

3  provided by Joel Spear and Defendants, concluded the value of the SCPC equity

4  purchased by the ESOP on November 21, 2007 was between $31 million and $37

5  million; therefore, SRR concluded the proposed purchase price of $35 million was

6  not more than fair market value.  SRR's value conclusion included a 10% control

7  premium and a 5% discount for lack of marketability.

8       63.    The $35 million stock purchase was financed by a $10 million senior

9  loan from First American Bank to SCPC and $29 million in Junior Notes from the

10  Spear Trust to SCPC ("Spear Note").  SCPC, in turn, loaned $32,600,000 to the

11  ESOP to finance the stock purchase from the Spear Family Trust (the ESOP

12  already had approximately $2.4 million in cash from SCPC's 2006 contribution to

13  the ESOP).  In addition, the Spear Family Trust received Warrants representing

14  27.5% of SCPC's equity.

15       64.    The transaction was supposed to close soon after the October 8, 2007

16  negotiation session.  However, the bank lender, First American Bank, discovered

17  an undisclosed personal injury lawsuit against SCPC, *Arias v. SCPC*, in the course

18  of its loan underwriting.  Reser's Due Diligence Checklist had requested

19  "Information regarding any material litigation, actual or threatened in which the

20  Company is or may become involved."  The response prepared by Defendant BCC

21  and signed by Spear stated "DNE," i.e., "Does Not Exist."  This response was not

22  true and, upon information and belief, Defendant BCC knew that it was not true.

23       65.    The close of the ESOP transaction was delayed until November 21,

24  2007, because Reser investigated the *Arias* lawsuit and negotiated additional

25  transaction terms relating to SCPC's potential liability arising from the *Arias*

26  lawsuit.

27       66.    After the Transaction closed on November 21, 2007, the Spears

28  COMPLAINT FOR VIOLATION OF CALIFORNIA SECURITIES LAWS

1    became very angry about the fees charged by the lawyers, financial advisors,

2    independent trustee, and other advisors who worked on the November 2007

3    Transaction.  The Spears threatened to sue some of the advisors. Defendant

4    Gelman sought to resolve this disagreement.  On November 28, 2007, Defendant

5    Gelman sent an email to Defendants Bixler, Harden and Chou to propose a

6    resolution.  In his email (only seven days after the Transaction closed), Defendant

7    Gelman stated BCC was focused on "closing the deal favorably at 35 million and .

8    . . any further delay would have resulted in a major drop in price because of the

9    sudden decline in sales. . . ."

### F. SCPC's Financial Projections as of 12/31/07 – a Mere Six Weeks After the November 2007 Transaction – Cut Projected Revenues by Half.

12       67.     Once the Transaction closed, SCPC had no reason to continue using

13   inflated financial projections, and so Joel Spear let the air out of the balloon.  Since

14   SCPC stock was not traded on a public market, SCPC was required to obtain an

15   annual valuation of the stock owned by the ESOP.  SRR began working on the

16   12/31/07 valuation a few months after the Transaction and asked SCPC for

17   financial projections as of 12/31/07.  On May 5, 2008, Moreno (who was by then

18   the Controller of SCPC) sent SCPC's 2008 financial projections (based on what

19   was known as of 12/31/07) to SRR as an email attachment.  In a May 16, 2008

20   email to Moreno, SRR requested that SCPC also provide SRR with 5 years of

21   financial projections.

22       68.     By email dated May 7, 2008, Moreno provided a status report to

23   Spear:

24         Andy Ward who is doing our year end ESOP valuation needs a
25         projection for 2008. **I e-mailed Glenn and he suggested we use an**
26         **accurate projection instead of the 2008 projection from the ESOP**
27         **transaction.**

28   COMPLAINT FOR VIOLATION OF CALIFORNIA SECURITIES LAWS
     CASE NO.                          Page 18

> Based upon our sales for the first 4 months @ $9.7M and projecting
> an average of $3M per month over the next 8 months ($24M) I
> calculate annual sales for 2008 to be $34M. I am also assuming costs
> of production @ 82% of sales calculating a gross profit from the jobs
> at 18%.

(Emphasis added).

69.     Moreno sent SCPC's financial projections as of 12/31/07 to SRR as
an email attachment on May 23, 2008.  Although only six weeks had passed since
the close of the Transaction, SCPC's projected contract revenues as of 12/31/07
were only half of the projected revenues used for the Transaction valuation on
November 21, 2007 :

SCPC Financial projections, in 000's.

|                   | 2008   | 2009   | 2010   | 2011   | 2012   |
| ----------------- | ------ | ------ | ------ | ------ | ------ |
| Contract Revenues | 33,000 | 36,300 | 40,000 | 44,000 | 48,400 |

70.     SRR was shocked by the updated projections, and arranged for a
conference call with Joel Spear and Moreno.  As Moreno reported to Defendant
Gelman and Joel Spear in a July 1, 2008 email, **"Our response pertaining to the
drop in the financial projection from $70 [Million] to $30 [Million] caused a
fall-out amongst Andy Ward's office."** (Emphasis added).

71.     On or about July 1, 2008, Joel Spear and Moreno had a phone call
with Andy Ward of SRR. Spear told Ward that BCC prepared the SCPC financial
projections used for the November 2007 Transaction, and these projections were
not valid or reliable at the time of the Transaction.  Ward then called BCC to
discuss his conversation with Spear and Moreno.

72.     In an email dated July 1, 2008, Defendant Gelman gave Spear and

COMPLAINT FOR VIOLATION OF CALIFORNIA SECURITIES LAWS
CASE NO.                           Page 19

Moreno a summary of what BCC had reported to him regarding Spear and Moreno's conversation with Andy Ward:

> **After your discussion with Andy, he called BCC and informed them that you told him that the forecasts were not valid at the time they were made or were not reliable.** Innocently you said something that in theory requires him to take action because the statements you made about the projections at the time of sale, again innocently, cause him to react as if you were saying "we mislead you ".. I know you did not say this but the way it came out from his standpoint and it has a negative impact.

> **Gilbert told me that you said the forecasts were prepared by BCC and you did not think they were attainable.** Since I know you better then Andy does I know you were reacting to his attack on the company's performance and misread what approach he was seeking. **Such a statement would NORMALLY result in Andy Ward filing a lawsuit against you for Fraud and seeking to "undo "or lower the ESOP price, most likely by $10,000,000. Due to his relationship with BCC he will not be filing a lawsuit.**

*Id.* (Emphasis added.)

73.     In his July 1, 2008 email to Spear and Moreno, Defendant Gelman also proposed a plan to call Andy Ward to "explain" Spear's statements to Ward in an attempt to mollify SRR.  Gelman outlined several excuses for SCPC's poor financial performance, e.g. SCPC expected to win additional contracts on the Naciemento water project at the time of the Transaction, and suggested changes to boost SCPC's financial projections.  Gelman knew that these excuses were not true and that the improved projections were not valid.  In his July 1, 2008 email, Defendant Gelman requested Spear's permission to call Andy Ward.

74.     By email dated July 1, 2008, Spear responded to Defendant Gelman's

email of the same date.  Spear agreed that Gelman's summary of Spear's conversation with Andy Ward "is almost word for word what I told him. . . ." Spear further opined that Andy Ward "is an idiot."  Spear also authorized Defendant Gelman to call Andy Ward as Gelman had proposed.

### G. Defendant Gelman Coached Spear on How to Cover-Up the Inflated Financial Projections Used for the November 2007 Transaction.

75.     Defendant Gelman had not wanted "an accurate projection" sent to SRR.  Gelman knew it was important to cover up the decision to use inflated financial projections for the November 2007 Transaction.  Following his telephone call to Andy Ward on or about July 3, 2008, Gelman warned Joel Spear in an email dated July 3, 2008 that Joel had to stay "on script," and never again suggest that the financial projections supplied for the Transaction were inflated:

> Joel:  I was able to pacify Andy Ward [of SRR], for now, but I am going to work on projections with Gilbert [Moreno] today and be involved in any future discussions with Andy.
>
> **Just to avoid any problems, we can never hint at, allude to, or in any way state that we did not believe in the forecasts BCC prepared in July or August of 2007 that lead [sic] to the sale in November of 2007. We have to reinforce that AT THAT TIME we were on board with steady growth** due to the following;
>
> a. We were optimistic that residential downturn might be offset by an increase in building condos, apartments, attached housing, low income housing
>
> b. We were confident of obtaining public works jobs as we were already bidding large projects other contractors did not have the capital to pull off
>
> c. We had a backlog with our main customers (Lenar [sic] for example) that was subsequently withdrawn
>
> Andy understands that you/we could not control the economy.  **The Company was sold based on a price that assumed we could cash**

**flow the debt and earn a rate of return for the new "owners".
Thus if the forecasts were overly optimistic the price paid was too
high.**

**Our position must be, and I recall we went over this in detail, that
at the time of the feasibility study the downturn in residential was
only a concern, not yet a reality and no one could have possibly
predicted just how bad it has become.**

(Emphasis added).

76.     On July 2, 2008, Defendant Gelman sent an email to Moreno
instructing Moreno to change SCPC's financial projections to eliminate declining
EBIDTA in 2010 and 2011.  Instead, Gelman told Moreno to raise SCPC's
projected EBIDTA for 2010 and 2011 back to 2007 levels.  Gelman also requested
that he and Moreno meet in person to prepare the revised projections.  Defendant
Gelman and Moreno then prepared a more palatable set of financial projections as
of 12/31/07, which were sent to SRR as an email attachment on July 22, 2008:

SCPC Financial projections, in 000's:

|                   | 2008   | 2009   | 2010   | 2011   | 2012   |
|-------------------|--------|--------|--------|--------|--------|
| Contract Revenues | 51,000 | 60,000 | 74,707 | 78,442 | 82,364 |
| **EBIT**          | 4,014  | 5,508  | 8,614  | 9,143  | 9,700  |

77.     These revised contract revenues projections as of 12/31/07 were
similar to the projections SCPC provided to Duff & Phelps in late 2006, but much
higher than the "accurate projection" sent to SRR on May 23, 2008.

78.     In an email dated July 22, 2008, Andy Ward of SRR asked Defendant
Gelman for an explanation of the downward revision:

We would like to get a brief writeup [sic] of the rationale for the

downward revision in the recently provided projections in relation to the projections that were provided to us for the transaction. I have attached both sets of adjusted projections for your reference. In particular, we are focusing on adjusted EBITDA. The trustee will need to know what occurred between Nov. 21, 2007 (closing of the transaction) and Dec. 31, 2007 that would cause such downward revision (i.e. market conditions, faster than anticipated slowdown in the residential market, longer than anticipated bid process in public works jobs, etc.)

79.     In an email dated July 22, 2008, Defendant Gelman responded with a list of excuses, including an admission that the financial projections used for the November 2007 Transaction were stale:

The projections were prepared during June or July of 2007, around the time of the feasibility study. Joel was very upfront at that time that he had no way of knowing how bad the residential downturn would be. He was extremely honest and open about this issue. He has already however anticipated this and diversified So Cal into some public works.

80.     Given that Gelman had described the housing market as in fear of a "residential market collapse" in September 2007, Gelman and Spear obviously knew "how bad the residential downturn would be" prior to the Transaction. Defendant Gelman knew the explanations in his July 22, 2008 email were not true.

**H. Joel Spear Never Intended to Keep the Promises He Made in the November 2007 Transaction.**

81.     The Stock Purchase Agreement and other Transaction agreements required SCPC and Joel Spear to fulfill several promises as part of the deal: (1) On or before December 5, 2007, SCPC was required to obtain a $2 million fiduciary liability insurance policy covering Reser effective on or before November 21, 2007; (2) On or before December 21, 2007, SCPC was required to purchase a $2

million company-owned life insurance (COLI) policy on Joel Spear with SCPC named as the beneficiary; (3) Spear's compensation was supposed to be reduced to $500,000 (with annual raises and potential bonuses as set forth in his employment agreement); and (4) SCPC was supposed to expand its Board of Directors beyond Joel and Linda Spear and add independent directors. Joel Spear and SCPC never fulfilled any of these promises.

82.     In fact, Spear had no intention of keeping these promises. Defendants, and each of them, were aware that Spear did not intend to fulfill key elements of the ESOP's consideration in the November 2007 Transaction, and assisted Spear in deceiving Reser and covering up Spear's deceptions.

83.     Spear's original plan was to purchase fiduciary liability and life insurance policies the day before the Transaction and then cancel the policies immediately after the Transaction closed. Spear wanted to deceive Reser, but did not want to spend any money doing so. Defendants BCC, Bixler, Chou and Harden knew of Spear's plan and assisted Spear in his efforts to implement this plan.

84.     By email dated November 20, 2007, Defendant Chou asked Spear's insurance broker if SCPC would receive a premium refund if it cancelled the insurance policies immediately after issue. Defendant Harden was copied on the email chain. The insurance broker was baffled by this plan. He wrote "I don't understand the strategy behind" cancelling the policies, but confirmed that SCPC would receive a premium refund in a November 20, 2007 email to Chou and Harden.

85.     Spear, however, was not even willing to go through with this charade because he did not want to pay the broker a $5,000 fee. The broker's proposal for the insurance policies included a $5,000 brokerage fee in addition to the commissions he would receive from the insurance companies. In a November 20,

1 | 2007 email, Defendant Chou asked the broker to reduce his fee: "can [you] lower

2 | the brokerage fee? **They plan on cancelling the policies right after the**

3 | **transaction and they do not want to pay 5k nonrefundable brokerage fee for a**

4 | **policy that will last a few days.**" (Emphasis added.)  The broker was taken aback

5 | by this request.  In a November 20, 2007 email responding to Chou's request, the

6 | broker stated "If they are planning on cancelling the policies immediately after the

7 | transaction closes . . ., our firm will receive zero commission and thus our

8 | brokerage fee becomes even more important.  Given their intent regarding the

9 | policies, I can not lower our fee as we deserve to be fairly compensated for our

10 | services."  Defendant Harden was also copied on these emails.

11 |     86.    Upon information and belief, Defendants Chou and Harden informed

12 | Defendant Bixler that Spear and BCC did not intend to purchase the insurance

13 | policies as required by the agreements for the November 2007 Transaction.

14 |     87.    Around the same time that Joel Spear and BCC were scheming to

15 | evade his promise to purchase insurance for the protection of the ESOP, Defendant

16 | Gelman assured Andy Ward of SRR that the Spears "are as solid as a rock in their

17 | relationships and never burn any bridges."  Defendant Gelman made this statement

18 | to Ward in a November 4, 2007 email.  The Spears were copied on the email and

19 | apparently forwarded Gelman's email to BCC.  Both Defendants Harden and Chou

20 | received copies of Gelman's email on November 4, 2007.

21 |     88.    SCPC never purchased the key man life and fiduciary liability

22 | insurance policies promised in the Transaction.

23 |     89.    By email dated July 22, 2008, SRR asked Defendant Gelman if Joel

24 | Spear had purchased the $2 million COLI policy.  By email dated July 22, 2008,

25 | Gelman indicated he did not know the answer to this question but would ask Joel

26 | Spear.  Defendant Gelman knew that Spear had not purchased the $2 million COLI

27 | policy, but failed to tell SRR or the ESOP Trustee about Spear's deception until

28 | COMPLAINT FOR VIOLATION OF CALIFORNIA SECURITIES LAWS

1  after Spear died.

2  **I. The November 2007 ESOP Transaction Left SCPC Insolvent.**

3     90.    The November 2007 Transaction left SCPC with $39 million in debt,

4  far more debt than the Company's cash flow could support.  SCPC was unable to

5  make the monthly interest payments on the Spear Note.  SRR's valuation of SCPC

6  as of December 31, 2007, stated "As of December 31, 2007, the Company also had

7  $276,890 of accrued interest related to the Seller Note."

8     91.    In an email dated October 2, 2008, Moreno asked Defendant Gelman

9  for advice on how to reduce the accrued interest liability on SCPC's interim

10  financial statements as of July 2008.

11    92.    In late 2008, the Spears wrote down nearly $7 million in SCPC's

12  liability from the Spear Note, reducing the liability to $22 million.  In a letter dated

13  December 15, 2008, the Spears told the ESOP's new Trustee – First Bankers Trust

14  Services, Inc. ("FBTS") – that the write-down was necessary to reduce SCPC's

15  debt load, improve its balance sheet, and reduce the Company's cash flow burden.

16  Upon information and belief, Defendant Gelman helped to draft this letter and

17  reviewed it before it was sent to FBTS.

18    93.    The Spears' December 15, 2008 letter to FBTS was not truthful.  The

19  Spears' primary motive in writing off $7 million from the Spear Note was to obtain

20  a capital loss in that amount to offset a capital gain resulting from problems with

21  the Spears' investment in AIG floating rate notes in their IRC 1042 investment

22  account.  Defendant Gelman advised the Spears on how to obtain a capital loss to

23  offset the capital gain and knew that the stated reason for the Spear Note write-

24  down was false, but took no action to correct the Spears' misstatement.

25    94.    SCPC was not able to make the monthly interest payments on the

26  Spear Note even after the write-down.  SRR's valuation of SCPC as of December

27  31, 2008 stated SCPC owed $2.5 million in accrued interest on the Spear Note as

28

1 | of that date.

2 |      95.    Following the November 2007 Transaction, the residential housing

3 | construction crisis continued, leaving SCPC without its primary source of revenue.

4 | SCPC failed in an attempt to shift its focus to public works projects.  The

5 | Company had to lay off much of its workforce.

6 |      96.    On January 9, 2010, Joel Spear committed suicide.  The Company

7 | ceased operations in the summer of 2010.  Linda Spear auctioned off all of the

8 | Company's equipment to repay SCPC's loan to First American Bank.  The SCPC

9 | stock owned by the ESOP has no value.

## VI.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION

Violation of California Corporations Code §§ 25401, 25504 and 25504.1

(By Plaintiff Against all Defendants and Does 1-10.)

14 |      97.    Plaintiff incorporates the allegations of the preceding paragraphs

15 | herein above as though fully set forth herein.

16 |      98.    California Corporations Code §25401 provides that it is unlawful for

17 | any person to offer to sell or sell a security in California by means of any written or

18 | oral communication which includes an untrue statement of a material fact or omits

19 | to state a material fact necessary in order to make the statements made, in light of

20 | the circumstances under which the statements were made, not misleading.  Cal.

21 | Corp. Code Section 25501 establishes civil liability for a violation of section

22 | 25401.

23 |      99.    In addition to the primary or direct civil liability established in section

24 | 25501, the Legislature has expressly extended liability for a violation of section

25 | 25401 to specified secondary actors.  Cal. Corp. Code Sections 25504 and 25504.1

26 | establish joint and several liability on the part of certain actors, including agents

27 | who materially aid in the transaction constituting the violation (§ 25504) and

28 | COMPLAINT FOR VIOLATION OF CALIFORNIA SECURITIES LAWS
CASE NO.           Page 27

1 persons who materially assist in the violation with the intent to deceive or defraud

2 (§ 25504.1).  *Apollo Capital Fund LLC v. Roth Capital Partners, LLC* 158

3 Cal.App.4th 226, 253 (2007).

4      100.   California Corporations Code § 25504.1 provides that every person

5 who materially assists in any violation of Section 25401 with intent to deceive or

6 defraud is jointly and severally liable with any other person liable for a violation of

7 Section 25401.  In committing the acts set forth herein, Defendants, and each of

8 them, materially aided and assisted in the violation of Section 25401, and did so in

9 furtherance of the conspiracy with the intent to deceive or defraud the ESOP's

10 Trustee, Daniel Reser, in order to sell SCPC stock to the ESOP far in excess of its

11 fair market value.

12      101.   Reser, the ESOP's Trustee, relied on Defendants' misrepresentations

13 and omissions as set forth in preceding paragraphs, and relied upon the absence of

14 omitted facts necessary to make the facts represented not misleading in purchasing

15 the securities.  Reser, the ESOP's Trustee, would not have purchased the SCPC

16 stock and/or would not have agreed to pay $35 million for the SCPC stock had he

17 known the true facts and the facts that were not disclosed by Defendants.

18      102.   In doing the things alleged herein, with the knowledge of wrongdoing

19 described herein, and with the intent to deceive of defraud the ESOP's Trustee,

20 Daniel Reser, Defendants, and each of them, violated Corporations Code Sections

21 25504 and 25504.1.

22      103.   Within one year of the filing of this action, Plaintiff discovered the

23 facts constituting such violation.

24      104.   As a direct and proximate result of Defendants' wrongful, deceptive

25 and/or fraudulent conduct, the ESOP is entitled to damages plus interest at the

26 legal rate from the date of said investment less any return actually paid on that

27 investment plus additional damages that it has incurred. In the alternative, the

ESOP has sustained economic harm, damage and loss, in amounts to be proven at trial. The ESOP's losses are in the millions of dollars.

## VII.    PRAYER

WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them, as follows:

1.    For special damages according to proof, all in a sum to be determined at time of trial;

2.    For general damages according to proof, all in a sum to be determined at time of trial;

3.    For other economic and consequential damages according to proof, including lost investment income, all in a sum to be determined at time of trial;

4.    For exemplary or punitive damages according to proof;

5.    For pre- and post-judgment interest;

6.    For costs of suit herein;

7.    For attorney's fees incurred;

8.    For attorney's fees incurred under Code of Civil Procedure § 1021.5; and

9.    For such other and further relief as the Court may deem proper and just.

Dated: November 1, 2012                    LEWIS, FEINBERG, LEE,
                                           RENAKER & JACKSON, P.C.

                                           DONAHOO & ASSOCIATES


                                           By: _____
                                                Richard E. Donahoo

1   Plaintiff hereby demands a Jury Trial.

2

3   Dated: November 1, 2012                    LEWIS, FEINBERG, LEE,
4                                              RENAKER & JACKSON, P.C.

5                                              DONAHOO & ASSOCIATES
6
7
                                    By:
8                                              Richard E. Donahoo

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28   COMPLAINT FOR VIOLATION OF CALIFORNIA SECURITIES LAWS
     CASE NO.                          Page 30